IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF MARYLAND
(Baltimore Division)

| | |
|---|---|
| In Re: * | |
| George T. Moran, Inc., * | Case No. 10-18337-RAG |
|  | (Chapter 11) |
| Debtor. * | |

\* \* \* \* \* \* \* \* \* \* \* \*

**RESPONSE OF CHIEF RESTRUCTURING OFFICER TO OBJECTIONS TO SALE MOTION**

Charles R. Goldstein, Chief Restructuring Officer, by his undersigned attorneys, files this Response to two (2) Objections to the Motion for an Order Authorizing the Sale of Substantially all of the Debtor's Assets Free and Clear of Certain Liens, Claims, Encumbrances, and Interests and for Assumption of Certain Executory Contracts and states as follows:

1. On April 15, 2010 (the "Petition Date"), George T. Moran, Inc. (the "Debtor") filed a voluntary petition for relief under Chapter 11 of the United States Bankruptcy Code in this Court (the "Bankruptcy Case"). The Debtor is engaged in the business of writing insurance policies for its insureds on behalf of various insurance companies.

2. Charles David Wallace and Brenda Diane Tamariz Wallace, filed a joint voluntary petition under Chapter 7 of the Bankruptcy Code on or about May 26, 2010 in the United States Bankruptcy Court for the District of Maryland (Case No. 10-21874) (the "Wallace Bankruptcy Case").

3. Mr. Wallace is the owner of 100% of the issued and outstanding stock in the Debtor (the "Stock"). The Stock is property of the bankruptcy estate in the Wallace Bankruptcy Case. Mr. and Mrs. Wallace are the sole directors of the Debtor (the "Directors").

4. Charles R. Goldstein is the Chapter 7 Bankruptcy Trustee in the Wallace Bankruptcy Case and accordingly, controls the bankruptcy estate's entire interest in the Stock, including, *inter alia*, all of the voting rights associated therewith.

5. The Directors determined that a sale of substantially all of the assets of the Debtor is in the best interests of the Debtor's bankruptcy estate and its creditors. Among other reasons, the Debtor's "book of business" is rapidly diminishing and the Directors have concluded that there is no prospect for a successful reorganization of the Debtor's financial affairs.

6. In addition, by an Informal Action of Shareholders and Directors dated as of June 22, 2010, the Directors irrevocably appointed Mr. Goldstein Chief Restructuring Officer of the Debtor (the "CRO") to conduct the sale of the Debtor's assets.

7. On July 9, 2010, the CRO, by his undersigned counsel, filed a Motion for an Order Authorizing the Sale of Substantially all of the Debtor's Assets Free and Clear of Certain Liens, Claims, Encumbrances, and Interests and for Assumption of Certain Executory Contracts {Dckt. No. 39} (the "Sale Motion).

8. Objections to the Sale Motion were due on or before August 2, 2010. Objections were timely filed by Peerless Insurance Company ("Peerless") {Dckt. No. 56} and Nationwide Mutual Insurance Company ("Nationwide") {Dckt. No. 58}. Neither Objection opposes this Court's authorizing the sale of the Debtor's assets, but each stake out certain positions that the CRO expects will be resolved prior to the hearing on the Sale Motion. This Response is filed in order to address some of the issues raised in the Objections insofar as they relate to the connections between the proposed purchaser and the Debtor, as well as the basis for valuing the Debtor's assets and the process for soliciting offers to purchase the Debtor's assets.

9. The CRO selected Moran Group, LLC (the "Purchaser") as the "stalking horse" bidder for the purchase of the Debtor's assets under the terms of its Asset Purchase Proposal dated July 8, 2010 (the "Agreement"). One of the objections raised by Nationwide is that the equity interest holders of the Purchaser include Marc Dorman, who Nationwide asserts has "an extensive professional history with Mr. Wallace and Mrs. Wallace." Nationwide Objection at ¶ 10. Nationwide speculates that Mr. Dorman's extensive professional history with Mr. and Mrs. Wallace has led him to offer to purchase the assets for their benefit "at below market value." Id.

10. The equity interest holders in the Purchaser are Marc Dorman and Matt Lehman, both of whom are employees of the Debtor. This disclosure is set forth in the Agreement attached to the Sale Motion.[1] The Purchaser (and its equity interest

---

[1] The CRO and his professionals were in frequent contact with the principal creditors in this case regarding the status of the sale process and the three largest creditors knew the identity of the equity

holders) have represented to the CRO that there is no agreement between the Purchaser (or its equity interest holders) and David Wallace and/or his spouse, Brenda Diane Tamariz Wallace. Mr. Dorman started to work for entities owned or controlled by Mr. and/or Ms. Wallace in approximately 2003 and Mr. Lehman joined later under a Nationwide mentee program. Accordingly, while the employment connection was only disclosed in the Agreement attached to the Motion, in fact, (i) the three major creditors knew of this employment connection and (ii) the connection did not result in any type of arrangement to purchase the Debtor's assets below market value. In fact, as set forth below, the CRO disputes any contention that the purchase price is below market value.

11. In their Objections, Nationwide and Peerless characterize the purchase price offered for the Debtor's assets as "discounted" from the market value of the assets, and Nationwide misstates that the proposed purchase price is $815,000. Nationwide Objection at ¶ 9; Peerless Objection at ¶12. In fact, the purchase price under the Agreement is $1,469,000.00. The cash payment to be paid by the Purchaser to the Debtor's estate is $815,000 (the "Cash Payment"). The Cash Payment shall be applied to the amount due to Commerce First Bank, the holder of a duly perfected and unavoidable first lien against and security interest in all of the Debtor's property as of

---

interest holders in the Purchaser on or before the date the Sale Motion was filed. Specifically, there are three creditors that constitute the substantial majority of claims against the estate: Commerce First Bank's secured claim in the approximate amount of $580,000, Peerless' secured claim in the approximate amount of $654,000, and Mike Egan Insurance Company's final money judgment in the amount of approximately $506,000. Nationwide has not filed a proof of claim and does not state that it holds a claim against the estate in its Objection. Nationwide requests that the Court require further notice of the connections described herein, but the three creditors with substantial claims against the estate are the ones whose recovery would be placed at risk if the sale process is delayed.

the petition date, in the approximate amount of $580,000.00. The remaining portion of the Cash Payment, approximately $235,000.00 shall be unencumbered by any other liens, interests, claims or encumbrances that existed as of the petition date. The non-cash portion of the purchase price is the Purchaser's "assumption and acquisition" of the secured claims of Peerless Insurance Company ("Peerless") in the amount of approximately $654,000.00. Peerless asserts that it holds a duly perfected security interest in the Debtor's assets. The Purchaser is proposing to assume and acquire the Peerless debt so that Peerless' secured claim would be extinguished and released against the Debtor and the Debtor's bankruptcy estate.[2] The cash payment of $815,000.00 plus the assumption and acquisition of secured debt in the amount of $654,000.00 equates to a total purchase price of $1,469,000.00 (the "Purchase Price"). Importantly, if the Sale Motion is granted, the sale will be fully consummated at a closing promptly thereafter, eliminating any risk to the estate regarding the Purchaser's ability to perform any obligations in the future.

12. The Purchase Price is in fact a fair and reasonable price for the Debtor's assets. The Purchased Assets include current assets and tangible assets such as furniture, fixtures and equipment. However, the primary asset that the Purchaser will acquire if the Sale Motion is granted is the Debtor's "book of business." As the CRO has disclosed in the Notice of Sale Motion served on all parties in interest on July 9, 2010, the Debtor's value the "book of business" (annualized agency commission) at

---

[2] The main objection raised by Peerless in its Objection is that it has not reached any such agreement with the Purchaser. The CRO acknowledges this, and that the sale proposed by the CRO in the Sale Motion is entirely contingent upon Peerless and the Purchaser reaching such an agreement.

$1,658,562 and states revenues of $1,905,000 (2008 FY), $2,318,419 (2009 FY) and $1,537,096 (2010 FY). The "annualized agency commission" of $1,658,562 represents the total commissions earned by the Debtor based upon the premiums charged to its customers under their respective policies. This is the most important figure that serves as a base line for valuing the book of business, which a purchaser would then discount for expected loss of customers, non-renewals, concentration levels by the Debtor's own producers, as well as the general risks associated with the fact that the Debtor is in bankruptcy proceedings.

13. By the time of the CRO's appointment, the Debtor was in a liquidity crisis. Peerless is holding pre-petition commissions earned by the Debtor because it (not unreasonably) insisted on a cash collateral order, and the Debtor has had difficulty making payroll and rent payments to its landlord. Between the adverse impact of being in Chapter 11 bankruptcy proceedings and the lack of liquidity, the CRO concluded that the book of business should be sold as soon as possible.

14. The CRO and his professionals initiated discussions with all known parties with an interest in purchasing the Debtor's book of business in order to allow the market place to determine the value of the Debtor's business. Two parties executed and delivered non-disclosure agreements. One of those parties made an offer to purchase the "book of business" for a cash payment of $200,000 plus earn out payments over 54 months of 25% of revenues generated from the "book of business" which was estimated to be $1,679,2949 based upon the Debtor's valuation of the book of business at $1,658,562. The proposal was made prior to the bidder's receipt

of any confidential financial information and was contingent upon a 30-day due diligence period which would not expire until early August 2010. The earn out payments over 4 ½ years was also unfavorable in that it would be subject to the creditworthiness of the bidder and substantially delay the administration of the bankruptcy estate. The second party to execute a nondisclosure agreement received a substantial amount of financial information and engaged in lengthy discussions with the CRO's professionals regarding the issues surrounding the purchase of the Debtor's book of business, up to and including the July 23, 2010 deadline for submitting a competing bid. That party elected not to submit a competing bid. Various other inquiries were made to the CRO and his professionals from other competitors of the Debtor, but each expressed an interest in purchasing the Debtor's "book of business" for substantially less than the secured debt.

15. Given the liquidity pressures on the Debtor, the substantial threat of a rapid decline in the value of the Debtor's book of business, and the nature of the offers received or expressed by potential buyers, the CRO contends that the proposed sale of the "book of business" to the Moran Group, LLC is a fair and reasonable sale under the exigent circumstances presented in this case, and is in the best interests of the bankruptcy estate and its creditors.

16. Peerless questions the authority of the CRO to control the sale of the Debtor's assets and appears to equate his role as CRO with that of a professional person subject to the requirements of Section 327 of the Bankruptcy Code. Peerless Objection at ¶ 14. The Objection is misguided as the authority of the CRO – a

specially appointed director by the incumbent directors-- was irrevocably granted by the two incumbent Directors of the Debtor in the Informal Action of Shareholders and Directors. Moreover, the law is well established that in his capacity as Chapter 7 Trustee of the Wallace estate, with 100% of the stock in the Debtor being property of the Wallace bankruptcy estate, the CRO could have called a special shareholders' meeting, displaced the incumbent directors, and appointed new directors. As stated by the Second Circuit, the "right to compel a shareholders' meeting for the purpose of electing a new board subsists during reorganization proceedings." Johns-Manville Crop. V. The Equity Security Holders Comm. (In re: Johns-Manville, Corp.), 801 F.2d 60 (2d Cir. 1986) (citing In re Bush Terminal Co., 78 F.2d 662, 664 (2d Cir. 1935)). Those who would seek to challenge that right would have to obtain an injunction based upon a showing that the shareholders exercising voting rights were guilty of "clear abuse" in calling a special meeting. Johns-Manville, 801 F.2d at 65. The Delaware Chancery Courts have followed the Second Circuit's decision in *Johns-Manville*, holding that shareholders' rights are not extinguished due to a bankruptcy proceeding, irrespective of the degree of insolvency of the debtor. NKFW Partners v. Saxon Indus., Inc., No. 7468, 1984 WL 8234 (Del. Ch. Aug. 8, 1984), *aff'd sub nom.*, Saxon Indus., Inc. v. NKFW Partners, 488 A.2d 1298, 1300 (Del. 1985). The right of shareholders to hold a meeting in order to remove incumbent directors was upheld recently in Fogel v. U.S. Energy Systems, Inc., No. 3271-CC, 2008 WL 15187 (Del. Ch. 2008). These cases establish that the voting rights of shareholders are not extinguished by virtue of the company filing chapter 11

proceedings, no matter the level of insolvency, the special meeting and exercise of voting rights is not subject to the automatic stay, and it is incumbent on those who would challenge the shareholder action to obtain an injunction upon a showing of "clear abuse." Accordingly, while the irrevocable assignment of control over the sale process was given by the consent of the incumbent directors of the Debtor, in fact, the CRO, in his capacity as Chapter 7 trustee of the Wallace Bankruptcy Case, could have unilaterally exercised this right and indeed, much broader rights in terms of the composition of the Debtor's board of directors.

WHEREFORE, the Chief Restructuring Officer requests that the Court grant the Sale Motion and such other and further relief as is fair and just.

Date: August 3, 2010                               /s/Joseph J. Bellinger, Esquire

Joseph J. Bellinger, Esquire
Offit Kurman, P.A.
8171 Maple Lawn Blvd. Ste 200
Maple Lawn, MD 20759
(443) 738 -1515
jbellinger@offitkurman.com

*Attorneys for Chief Restructuring Officer*

I HEREBY CERTIFY, that on the 4th day of August, 2010, a copy of the foregoing Response was mailed first-class, postage prepaid, to the following:

Office of the United States Trustee
300 West Pratt Street, Suite 350
Baltimore, MD 21201

Peter J. Haley, Edquire
Nelson Mullins Riley & Scarborough LLP
One Boston Place, Suite 4040
Boston, MA 02108

Mark F. Scurti, Esquire
Hodes Pessin & Katz, PA
901 Dulaney Valley Road, Suite 400
Towson, MD 21204

Lynn Krause, Esquire
Krause & Ferris
196 Duke of Gloucester
Annapolis, Maryland 21401

Kevin Arthur, Esquire
Kramon & Graham
One South Street, Suite 2600
Baltimore, MD 21202-3201

George T. Moran, Inc.
696 Ritchie Hwy.
Severna Park, MD 21146

Lori Simpson, Esquire
Bishop, Daneman & Simpson
1400 South Charles Street
Baltimore, MD 21230

And served via electronic notification on all those who have entered an appearance in this bankruptcy case.

/s/*Joseph J. Bellinger, Esquire*
Joseph J. Bellinger